544 So.2d 1370 (1989)
Willie Ray CONERLY
v.
STATE of Mississippi.
No. 58218.
Supreme Court of Mississippi.
May 10, 1989.
Rehearing Denied June 28, 1989.
*1371 Sam P. Cooper, Jr., Picayune, Bobby J. Garraway, Lumberton, for appellant.
Mike Moore, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ANDERSON, Justice, for the Court:
Willie Ray Conerly was indicted by a Pearl River County Grand Jury on a charge of armed robbery and was tried August 21, 1986, which trial resulted in a mistrial when the jury was unable to agree upon a verdict. He was retried on January 27, 1987, and the jury returned a verdict of guilty and a sentence of life imprisonment. Conerly appeals, alleging that: the prosecutor violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); the trial court erred in overruling his motion to dismiss based on denial of a speedy trial; the trial court erred in admitting the State's exhibits; and, the trial court erred in denying his motion for new trial. In reversing we address only Conerly's Batson claim.

I.
It is unnecessary, for purposes of this appeal, to provide a full recitation of the facts. Witnesses testified that Conerly robbed a Picayune, Mississippi, convenience store on August 18, 1985. In the process of the robbery, Conerly held two employees at gun point and obtained over three hundred dollars ($300.00) in cash. Conerly admitted that he had been in the store on the day of the robbery, but claimed an alibi for the time of the robbery. On this conflicting evidence the jury returned its guilty verdict.

II.

BATSON ISSUE
Forty-nine venire persons were present at Conerly's trial. Nine of those forty-nine were black. The trial court excused two of the nine for cause. The state accepted one black venire person and used five peremptory challenges to exclude black venire persons. A jury composed of eleven whites and one black was accepted before reaching the last black venire person.
Our concern today centers on the state's challenge of one of the five excluded black venire persons. The portion of the jury selection process involving Juror Jean Swain is taken from the record and is as follows:
THE COURT:
Let the record show that Willie Ray is a member of the Black race, and therefore the Court will require if the State exercises any challenges on Black jurors, to state their reason for so doing. Whether or not I have all of the jurors marked that are Black, I'm not absolutely certain, so Mr. Cooper, if the State does strike a Black juror and I fail to require an explanation, would you please bring it to my attention that that juror being struck is Black.
* * * * * *
MR. McDONALD:
We are going to strike Jean Swain, ..., who is Black, because she was unable to completely fill out her form, and we believe she lacks the 
THE COURT:
Let's see her form.
MR. DOUGLASS:
She is also confused on some of it. I can't figure her age out.
THE COURT:
Let the record show that Jean Swain filled out her form by printing and put her age as XX-X-XX-XX, which could mean fifty-nine years old and that she was born on May 27th of the year 1927, which would be very sensible. Her occupation is maid one day per month; her address is Mrs. Harris Love, 318 North Hickory; she shows a marital status of separated; *1372 how long worked there, twenty years; she did finish high school  well, she's got high school checked, but highest grade completed, 11th. She wouldn't have to fill in outside the county seat because she lives in Poplarville and that is the county seat.
MR. DOUGLASS:
Doesn't say how long she lived 
THE COURT:
Does not fill out how long she has lived in Pearl River County. And does her husband or wife work, she didn't fill out any of that but she shows she's separated. Then she does put the name of her mother and her father. So if that's your reason, the form to me is filled out adequately and I believe that her age would be  the month and date and year would show to be the age.
Do you object to the excusing of her?
MR. COOPER:
Yes, sir.

(JURY SELECTION CONTINUED  OFF THE RECORD)
In order to "establish a prima facie case of purposeful discrimination in selection of the petit jury" a criminal defendant must show:
1. That he is a member of a "cognizable racial group";
2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and
3. That facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities.
Batson, 476 U.S. at 96-97, 106 S.Ct. at 1722-23, 90 L.Ed.2d at 87-88; Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987).
Conerly has complied. He has shown that he is a black person and that the district attorney has exercised peremptory challenges to remove black persons from the jury  Jean Swain and four others. Finally, the fact that the prosecution used all of the peremptory strikes necessary (five) to remove all but one black person from the jury satisfies the requirement of raising an inference of racial discrimination.
The prima facie showing satisfied, the state is compelled "to come forward with a neutral explanation for challenging black jurors" [footnote omitted]. Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88; Lockett, 517 So.2d at 1349. The trial court should then determine, on the record, whether each of the state's reasons for striking black jurors is, in fact, racially neutral.
[A] trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence.
Lockett, 517 So.2d at 1350.
The difficulty in the instant case lies in the fact that the trial court made a factual determination that Juror Swain's information card was adequately filled out, as well as an implied determination that Swain was not confused. The trial court was also able, without any difficulty whatsoever, to discern Juror Swain's age and birthdate. Having determined that the state's explanation did not provide a valid reason for striking Swain, the trial court was obligated to seat her on the jury unless the state could suggest another racially neutral reason for striking her. The district attorney did not articulate any other Batson eligible reason for challenging Swain.
As we noted in Chisolm v. State, 529 So.2d 635 (Miss. 1988):

Batson tells us
`A single invidiously discriminatory governmental act' is not `immunized by the absence of such discrimination in the making of other comparable decisions'. 476 U.S. at 95 [106 S.Ct. at 1722], 90 L.Ed.2d at 87.
That the prosecutor accepted other black persons as jurors is no defense to a Batson claim.
Chisolm, 529 So.2d at 637.
In light of the prosecutor's failure to articulate a valid race-neutral reason for *1373 striking Juror Swain, the trial court's factual determination that she was eligible and the case law recited above, we have no alternative but to reverse this case and remand for a new trial.
REVERSED AND REMANDED.
ROBERTSON, PRATHER and SULLIVAN, JJ., concur.
ROY NOBLE LEE, C.J., and HAWKINS and DAN M. LEE, P.JJ., dissent.
PITTMAN and BLASS, JJ., not participating.
ROY NOBLE LEE, Chief Justice, dissenting:
I do not agree with the majority opinion reversing this case on the Batson issue, and, therefore, I dissent. In order to properly present my view, a full picture of the facts must be given.
Willie Ray Conerly was indicted in the Circuit Court of Pearl River County on a charge of armed robbery and was tried August 21, 1986, which trial resulted in a mistrial when the jury was unable to agree upon a verdict. He was tried a second time on the charge January 27, 1987, and the jury returned a verdict of guilty and a sentence of life imprisonment. Conerly has appealed to this Court from that conviction and sentence.
On August 18, 1985, between 6:15 p.m. and 6:20 p.m., a black male robbed Bill's Quick Stop # 1 in Picayune, Mississippi, and obtained over three hundred dollars ($300.00) in cash. According to Randy Mitchell, an employee of the convenience store, Conerly came in and bought a 16-oz. beer. Approximately five minutes later, he returned, pulled the beer out of the bag, put it on the counter and pulled out a gun. He pointed the gun at Mitchell's head and ordered him to open the cash register, and, as Mitchell was complying with the order, his co-employee, Darrell Holifield, returned from the back of the store where he had been stocking the cooler. Conerly pointed the gun at Holifield and ordered him behind the counter. Mitchell and Holifield testified that Conerly held the gun in his left hand and began stuffing money into his pockets with his right hand. Some of the money fell to the floor. Conerly stooped to pick it up.
A young woman named Marlette Brown, who said she had known Conerly for several years, testified that she walked in and saw Conerly bending over picking money up off the floor and the two employees were standing behind the counter next to each other with the cash register open and Conerly had a gun on them.
Lt. Tony Gibson, a sergeant with the Picayune Police Department, responded to a call and arrived at the store about 6:25 p.m. He dusted the door, counter area and beer can for fingerprints and lifted one latent (usable) print from the beer can.
Sarah McCray lives approximately one and one-half blocks from the Quick Stop. According to her, she and Conerly had a former live-in relationship and Conerly came by her house on the night of the robbery between 6:30 and 7:00 p.m. When he arrived, he was sweating and said he had been running; he had a gun which he placed on her dresser before taking a shower; and after showering, he changed shirts but put on the same pants. McCray gave the shirt and hat to Officer Gibson later that evening.
Mitchell, Holifield and McCray positively identified the shirt as that worn by Conerly on the night of the robbery. Ron Smith, a fingerprint examiner with the Mississippi Crime Laboratory in Jackson, compared the fingerprint lifted from the beer can with two sets of Conerly's known fingerprints, obtained from the Picayune Police Department files. Smith testified that the fingerprint from the beer can was identical to Conerly's right thumbprint.
Conerly's defense was an alibi. He testified that he was at his grandmother's house in Picayune from the night of August 17 until the next morning, Sunday, August 18, 1985; that around noon, his sister, who was living in New Orleans, called to say his mother, who had had a stroke, was not doing well and wished to see him; he picked up his gun and, because *1374 he had enemies in New Orleans, wanted to be prepared for trouble; that between 1:30 and 2:00 p.m. he went to the Quick Stop and bought a beer from Mitchell; that after he left the store, he went back immediately and exchanged the beer for a pack of cigarettes; that he did go by McCray's house at 6:20 p.m. and was there fifteen or twenty minutes, then left and went to the house of his friend, Keith Lewis, to find out whether or not he would take him to New Orleans.
According to Lewis, Conerly arrived "late in the evening" and "just before the sun went down" on August 18, 1985, around "6:20 or 6:30, something like that." He said that Jones agreed to take Conerly to New Orleans, and that Lewis and Jones were with Conerly for one hour and forty-five minutes. Conerly's mother testified that he arrived in New Orleans between 6 and 7 p.m. and his sister testified that the hour was 7:20 p.m. when he arrived.
The appellant has assigned four errors in the trial below contending (1) that the lower court erred in overruling the appellant's motion to dismiss on speedy trial grounds; (2) that the lower court erred in admitting the State's exhibits; (3) that the lower court erred in declining to grant him a new trial on the ground that the verdict was against the overwhelming weight of the evidence; and (4) the Batson issue. The Court concurred that there was no merit in the first three assigned errors and, thus, the reason for addressing only the fourth question.

BATSON Issue
Appellant contends that the lower court erred in permitting the State to exercise five of its peremptory challenges against black jurors, and that the reasons given by the State for striking blacks from the jury were insufficient under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We address that issue.
At the outset, it is noted that appellant did not raise the question of systematic exclusion of blacks from jury service in Pearl River County as articulated in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Therefore, the Swain question is procedurally barred.
At the trial of the case sub judice a total of forty-nine (49) venire persons were present. Nine (9) of them were black. The lower court excused two of those nine for cause. The State accepted one black venire person on the jury and used five (5) of eleven (11) peremptory challenges to exclude black venire persons. Six (6) peremptory challenges were used to exclude white venire persons. The trial jury was composed of eleven whites and one black. Of the five black venire persons peremptorily challenged by the State, only two spoke during the voir dire. When defense counsel asked if any venire persons, a family member, or close personal friend, had been victims of a crime, Betty F. Richardson raised her hand. When her number was called, she replied, "I thought you said committed a crime." Maggie Mae Brumfield approached the bench to discuss her religious principles with the judge. Voir dire on peremptory challenges relating to black venire persons was recorded and follows:
THE COURT:
Let the record show that Willie Ray is a member of the Black race, and therefore the court will require if the State exercises any challenges on Black jurors, to state their reason for so doing. Whether or not I have all of the jurors marked that are Black, I'm not absolutely certain, so Mr. Cooper, if the State does strike a Black juror and I fail to require an explanation, would you please bring it to my attention that that juror being struck is Black.
* * * * * *
THE COURT: (In re 54)
The State will state their reason for striking Armanda Thomas, Juror 11 on the special venire, who is Black.
MR. McDONALD:
We are going to strike her because today she was the elderly juror, she's seventy-five years old. She is the elderly juror that came in there and couldn't understand where to go when they got *1375 back there to fill in the rows. In addition to that, I talked to the individuals in the Chancery Clerk's Office and they say she comes in there, she's confused and disoriented and asking about things, and they don't believe she's got the mental where-withal to be on there. And That's why we are striking her.
MR. COOPER:
Judge, we would object to the striking of Armanda Thomas. I don't know whether we need to note that in the record or not.
(JURY SELECTION CONTINUED  OFF THE RECORD)
MR. McDONALD:
We are striking Charles M. Taylor, Juror 3 on Jury 1, who is Black, because our understanding from Charles Stockstill is he was convicted of possession of open beer in Picayune; he's wearing a diamond earring in his ear, which I don't believe is  you know, to me that's a radical kind of dress for a young male, and to me that evidences a psychology  or social beliefs that are incompatible with prosecution philosophy. And also, when he came in, he came in with a group of the witnesses for the defendant, and I don't know whether he came in with them or not; I mean, I don't know whether he came up here with them or not or whether he had been talking to them or not, but he came in with them and I'm just not willing to take that chance.
MR. COOPER:
To which we would object to that strike.
(JURY SELECTION CONTINUED  OFF THE RECORD)
MR. McDONALD: (In re 57)
We are going to strike Jean Swain, Juror 1 or Juror 2, who is Black, because she was unable to completely fill out her form, and we believe she lacks the 
THE COURT:
Let's see her form.
MR. DOUGLASS:
She is also confused on some of it. I can't figure her age out.
THE COURT:
Let the record show that Jean Swain filled out her form by printing and put her age as XX-X-XX-XX, which could mean fifty-nine years old and that she was born on May 27th of the year 1927, which would be very sensible. Her occupation is maid one day per month; her address is Mrs. Harris Love, 318 North Hickory; she shows a marital status of separated; how long worked there, twenty years; she did finish high school  well, she's got high school checked, but highest grade completed, 11th. She wouldn't have to fill in outside the county seat because she lives in Poplarville and that is the county seat.
MR. DOUGLASS:
Doesn't say how long she lived 
THE COURT:
Does not fill out how long she has lived in Pearl River County. And does her husband or wife work, she didn't fill out any of that but she shows she's separated. Then she does put the name of her mother and her father. So if that's your reason, the form to me is filled out adequately and I believe that her age would be  the month and date and year would show to be the age.
Do you object to the excusing of her?
MR. COOPER:
Yes, sir.
(JURY SELECTION CONTINUED  OFF THE RECORD)
MR. McDONALD: (In re 59)
The State will strike Maggie Mae Brumfield, Juror 6 on Jury 2, who is Black, because we have been advised she was arrested for public drunk in 1982 in Picayune. And then after the jury was voir dired and after the Judge had left the bench, she asked to talk to the Judge, and she came up and talked to the Judge in kind of a rambling way about her religious principles.
THE COURT:

*1376 In the presence of the Defendant and the Defense counsel and the State, by the way.
MR. McDONALD:
That's right. Everyone was there. And the Judge questioned her fully about it and didn't feel like that her religious principles were enough to excuse her.
THE COURT:
I questioned her about it and got three different answers, that her religious principles would interfere with her being a fair juror, that they would not interfere with her being a fair juror, and that despite her religious principles she would just do whatever she thought she ought to do.
MR. McDONALD:
Plus it looks like  is that the one that works for Mrs. Crosby? It says she a maid, she lives on Howard Avenue, she's fifty-eight, that she's a housekeeper and she works in the Crosby home.
THE COURT:
Which Crosby?
MR. McDONALD:
I don't know. But there's some question in my mind as to whether or not she works in one of the Tommy Crosby or L.O. Crosby homes.
THE COURT:
Let the record show that Pat Crosby is the wife of Tommy Crosby, T.L. Crosby.
MR. McDONALD:
That's why we're striking her, for all those reasons.
(JURY SELECTION CONTINUED  OFF THE RECORD)
MR. McDONALD: (In re S11, State striking Betty Richardson, Juror 10 on Jury 2, who is Black)
We would strike her because during voir dire she said that there was a close friend or member of the family who had committed a crime.
MR. COOPER:
I didn't get that now.
MR. DOUGLASS:
Well, she did say that.
MR. McDONALD:
Over and above that, we questioned an individual who works in the Chancery Clerk's Office at the courthouse, and she gave us information to indicate that she runs with a bad crowd. For those two reasons we would strike her.
MR. COOPER:
We would object to the striking of Betty F. Richardson.
* * * * * *
MR. McDONALD:
I'd like to say that I have struck Black and White jurors, and the Defense has struck nothing but White jurors. I'm not going to object to that. But also this hearsay stuff, you know, is things law enforcement officers are giving me about criminal records the people have. You know, I'm thirty-eight years old but when I see a man showing up with a diamond earring in his ear, I don't think that man, White or Black, is going to be favorable to the State of Mississippi. I would have struck him whether he was white, black, red, yellow, or green, you know. And if somebody of the Black race who I think is a law-abiding, upstanding, moral citizen and knows one of the jurors and tells me that that woman runs with a bad crowd and she wouldn't have anything to do with her, I'm going to strike her, too, the same as I would if a White person told me that.
THE COURT:
In other words, you're saying the persons you conferred with in the Chancery Clerk's Office were some of the Black employees?
MR. McDONALD:
Yes, sir.
THE COURT:
All right.

(JURY SELECTION CONTINUED  OFF THE RECORD)
The appellant, in raising the Batson claim, was required to show:
1. That he is a member of a "cognizable racial group";

*1377 2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and
3. That facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of strike minorities.
Batson v. Kentucky, 476 U.S. 79, 96, 106 S.Ct. 1712, 1722-23, 90 L.Ed.2d 69, 87 (1986); Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987).
[T]hese components constitute the prima facie showing of discrimination necessary to compel the "state to come forward with a neutral explanation for challenging black jurors" [footnote omitted]. Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.
Lockett, 517 So.2d at 1349.
[A] trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference and will not be reversed unless they appear clearly erroneous or against the overwhelming weight of the evidence.
Lockett, 517 So.2d at 1350.
Each of the race neutral reasons given by the prosecutor in the present case was accepted by the lower court and have been accepted at various times by this Court. See Lockett, 517 So.2d at 1351-52. Only the reason given for peremptorily excusing Jean Swain appears to be somewhat fuzzy, but the fact remains that Jean Swain did not completely fill out her juror card and in Lockett, supra, "failure to complete juror's card" was noted as a valid explanation. 517 So.2d at 1356.
Appellant's attorney did not rebut the explanation given, or preserve in the record any suggestion that the reasons were merely pretexts. This Court does not have before it the venire persons' juror cards. Therefore, it is impossible to determine whether any of those venire persons who did make it onto the jury had failed to complete their cards. In reviewing the reasons given by the prosecutor for peremptorily challenging the black jurors, the statement made by the prosecutor at the conclusion of the voir dire that the black jurors were excused after the prosecutor's conference with, and advice from, black employees in the clerk's office, indicates that there was no design on the part of the prosecutor to discriminate against black jury members by excusing them and that the court system itself was not tainted by those peremptory challenges.
I am of the opinion that the State survived the challenge on the Batson issue. The majority puts a microscope on only one juror, i.e., Jean Swain, for the reason that the trial judge stated her information card was adequately filled out. Yet, he understood the Batson question and allowed the peremptory challenge. We must assume that the lower court correctly determined the peremptory challenge was justified in allowing same.
Assuming that the lower court erred in declining to sustain the objection to the Jean Swain peremptory challenge, the error was harmless under the facts of this case. Death penalty is not involved. As we have said, harmless error in a non-capital case may rise to reversible error in a death penalty case. Applying the same rule in reverse, error which may be reversible in a death penalty case, would be harmless in a case not involving the death penalty. Fisher v. State, 481 So.2d 203, 211 (Miss. 1985); Jones v. State, 461 So.2d 686, 690 (Miss. 1984); Williams v. State, 445 So.2d 798, 810 (Miss. 1984); Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978).
Under the facts of this case, Conerly's guilt beyond reasonable doubt is overwhelming. No reasonable juror could have found otherwise. Under the decisions of this Court and the federal system, harmless error does not require reversal. This Court has held that a conviction may stand if an error does not "undermine confidence in the outcome of a trial." Malone v. State, 486 So.2d 367, 396 (Miss. 1986). See also Buckhalter v. State, 480 So.2d 1128, 1129 (Miss. 1985), holding that error does not require reversal under former Sup.Ct. Rule 11 "unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice." The Supreme Court of the United *1378 States has held that "not all constitutional violations amount to reversible error" and that "if the prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict, the error is harmless and the verdict may stand." Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
Therefore, I dissent for the reason that, in my view, the majority opinion is not supported by Mississippi law or federal decisions.
HAWKINS and DAN M. LEE, P.JJ., join this dissent.